

**FILED**

**DISTRICT COURT OF GUAM**

**AUG 09 2021**

**JEANNE G. QUINATA**
**CLERK OF COURT**

# UNITED STATES DISTRICT COURT

for the

District of Guam

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

334 East Chalan Guma Yuus, Sinajana, GU 96926 (See
Attachment A)

)
)
)
)
)

Case No. MJ-21 - 00170

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

334 East Chalan Guma Yuus, Sinajana, GU 96926.  Property further described in Attachment A.

located in the _____ District of _____ Guam _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sections 2252 and 2252A | Possession of child pornography |

The application is based on these facts:

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

David B. Anderson, Special Agent, FBI
*Printed name and title*   AO

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date:  9 Aug 2021

_____
*Judge's signature*

City and state:  Hagatna, Guam

MICHAEL J. BORDALLO, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION**</u>
<u>**FOR A WARRANT TO SEARCH AND SEIZE**</u>
<u>**334 EAST CHALAN GUMA YUUS, SINAJANA, GU 96926**</u>

I, David B. Anderson, being first duly sworn, hereby depose and state as follows:

## **INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 334 East Chalan Guma Yuus, Sinajana, GU 96926, hereinafter "PREMISES", further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been for more than thirteen (13) years. I am currently assigned to the Violent Crimes Squad and part of the Marianas Child Exploitation Human Trafficking Task Force (MCEHTTF) of the FBI Honolulu Field Office, Guam Resident Agency, where my duties include, but are not limited to investigating sex & labor trafficking, child exploitation crimes including the online production, distribution, and possession of child pornography, and other crimes of violence. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and empowered by 18 U.S.C. § 3052 to conduct investigations of, and to make arrests for violations of federal criminal statutes. I have gained knowledge and experience through training at the FBI Academy, in service training, and daily work in conducting these types of investigations. I have received training in the areas of child pornography and child exploitation investigations and have reviewed numerous examples of child pornography as defined in 18 U.S.C. § 2256, in various forms of media, including computer media. I have also conducted searches pursuant to federal search warrants relating to several other child pornography investigations. Through my training and experience, I have

become familiar with the manner in which criminal offenders operate, and the efforts of those individuals to obfuscate such activities.

3. During my tenure as a Special Agent with the FBI, I have participated in numerous investigations where I have (a) conducted physical and wire surveillance; (b) executed search warrants for electronic devices; (c) conducted surveillance of individuals engaged in the sexual exploitation of children, drug traffickers, and other violations of federal and state law; (e) and arrested offenders for the online production and distribution of child pornography.

4. The statements in this affidavit are based in part on information provided by Task Force Officers, other Special Agents of the FBI and on my experience and background as a Special Agent of the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violations of 18 U.S.C. §§ 2252 and 2252A, are located within a computer and/or related peripherals, identified in Attachment B at the PREMISES further described in Attachment A.

## PERTINENT CRIMINAL STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors.

6. 18 U.S.C. §§ 2252 and 2252A prohibit a person from knowingly possessing or accessing sexually explicit images (child pornography) with the intent to view them as well as transporting, receiving, distributing, or possessing in interstate or foreign commerce, or by using any facility or means of interstate or foreign commerce, any visual depiction of minors engaging in sexually explicit conduct (child pornography).

2

## DEFINITIONS AND TECHNICAL TERMS

7.     The following non-exhaustive list of definitions applies to this affidavit and Attachments A and B to this affidavit:

a.  "Child Pornography" includes the definition in 18 U.S.C. § 2256(8) and means any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct.

b.  "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not, in and of themselves, obscene or illegal. In contrast to "child pornography," this material does not necessarily depict minors in sexually explicit poses or positions. Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writing, and diaries. See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis (2001) at 65. Federal courts have recognized the evidentiary value of child erotica and its admissibility in child pornography cases. See *United States v. Cross*, 928 F.2d 1030 (11th Cir. 1991) (testimony about persons deriving sexual satisfaction from and collecting non-sexual photographs of children admissible to show intent and explain actions of defendant); *United States v. Caldwell*, No. 97-5618, 1999 WL 238655 (E.D. Ky. Apr. 13, 1999) (child erotica admissible under Federal Rule of Evidence 404(b) to show knowledge or intent).

3

c. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

d. "Minor" means any person under the age of eighteen years. See 18 U.S.C. § 2256(1).

e. "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

f. "Computer" as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

g. "Computer hardware" as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives, USB flash drives, and diskettes, and other memory storage devices); mobile telephone devices, portable memory devices, portable electronic music players, video gaming systems; peripheral

4

input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks) and wireless devices, capable of connecting other computer hardware to the Internet.

h. "Computer software" as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. "Computer-related documentation" as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related item.

j. "Computer passwords and data security devices" as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may

5

also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

k. The "Internet" as used herein is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l. "Internet Service Providers" or "ISPs" are commercial organizations, which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone-based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite-based subscription and wireless communication. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a username or screen name, an e-mail address, and an e-mail mailbox and the subscriber typically create a password for the account. By using a computer equipped with a telephone or cable modem, or wireless device, the subscriber can establish communication with an ISP over a telephone line or through a cable system, or via radio waves, and can access the Internet by using his or her account name and password.

6

m. "ISP Records" are records maintained by ISPs pertaining to their subscribers (regardless of whether those subscribers are individuals or entities). These records may include account application information, subscriber and billing information, account access information (often times in the form of log files), e-mail communications, information concerning content uploaded and/or stored on or via the ISP's servers, and other information, which may be stored both in computer data format and in written or printed record format. ISPs reserve and/or maintain computer disk storage space on their computer system for their subscribers' use. This service by ISPs allows for both temporary and long-term storage of electronic communications and many other types of electronic data and files.

n. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses. A computer with a dynamic IP address means the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

7

o. "Image" or "copy" refers to an accurate reproduction of information contained on an original physical item, independent of the electronic storage device. "Imaging" or "copying" maintains contents, but attributes may change during the reproduction.

## BACKGROUND ON COMPUTERS AND CHILD PORNOGRAPHY

8.     Computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these images on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls.

9.     The development of computers has changed this; computers serve four basic functions in connection with child pornography:  production, communication, distribution, and storage.

10.     Child pornographers can now transfer photographs from a camera onto a computer readable format with a device known as a scanner. With the advent of digital cameras, the images can be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of a telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

8

11.     The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The storage capability of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously over the years. These drives can store hundreds of thousands of images at a very high resolution.

12.     The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

13.     Collectors and distributors of child pornography also use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Microsoft, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides e mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

14.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer contains peer to peer

9

software, when the computer was sharing files, and even some of the files which were uploaded or downloaded. Such information may be maintained indefinitely until overwritten by other data.

15.     A popular tool used by individuals involved in the collection and distribution of child pornography on the Internet, is peer to peer file sharing (hereinafter, "P2P"). P2P file sharing is a method of communication available to Internet users through the use of special software. Computers linked together through the Internet using this software form a network that allows for the sharing of digital files between users on the network. P2P software is readily available for download on the Internet and is often available for free. In general, P2P software allows the user to set-up file(s) on his computer so that the files can be shared with others running compatible P2P software. In essence, a user allows his computer to be searched and accessed by other users of the network. If another user finds a file of interest on his computer, the P2P software allows that other user to download the file from your computer. A user obtains files by opening the P2P software on his computer and typing in a search term or terms. The P2P software then conducts a search of all computers connected to that network to determine whether any files matching the search term are currently being shared by any other user on that network. The P2P software programs known as eMule, Ares Galaxy, LimeWire, FrostWire, and many other types of P2P software, sets up its searches by keywords. The results of a keyword search are displayed to the user. The user then selects file(s) from the results for download. The download of a file is achieved through a direct connection between the computer requesting the file and one or more computers on the same network containing the file.

16.     The strength of the P2P Networks is that they base all of their file shares on a hashing algorithm. Hashing uses mathematical algorithms which allows for the creation of an

Case 1:21-mj-00170   Document 1   Filed 08/09/21   Page 11 of 34

alpha-numeric value specific and unique to that file, which is the equivalent of a digital fingerprinting of the file. For example, once you check a file with a Secure Hash Algorithm (SHA-1) hashing utility capable of generating this SHA-1 value (the digital fingerprint), that will be a fixed-length unique identifier for that file. The SHA-1 is called secure because it is computationally infeasible for two files with different content to have the same SHA-1 hash value. Law Enforcement can search the P2P networks to locate individuals sharing previously identified child exploitation material in the same way a user searches this network. When a user on the P2P network offers a file to trade, the P2P software used by law enforcement calculates a "hash value" of the file using a SHA-1 hash. A person may copy a file and rename it but if it is an exact copy, regardless of the name of the file, it will have the same hash value.

17.     Most P2P programs allow users to designate specific folder(s) as "shared" folders. Any files contained in those specific folders are then made available for download by other users on the same P2P network. P2P software users typically do not "share" all of the files on their hard drive.

18.     The BitTorrent network is a very popular and publicly available P2P file-sharing network. Most computers that are part of this network are referred to as "peers" or "clients," hereafter referred to as a peer. A peer can download files from other peers simultaneously and provide these files to other peers.

19.     The BitTorrent network can be accessed by computers via many different client (software) programs, such as the "BitTorrent" program, the "μTorrent" program, the "BitLord" program, and the "Vuze" program, to name a few. These client programs are publicly available, typically free, and can be downloaded from the Internet.

11

20.     During the query and/or downloading process from a suspect BitTorrent network client, certain information may be exchanged between an investigator's BitTorrent client program and the suspect client program they are querying and/or downloading a file from. This information includes 1) the suspect client's IP address; 2) a confirmation from the suspect client that they have pieces of the file(s) being requested, in whole or in part, and that the pieces of the file(s) are being reported as shared from the suspect client program; and 3) the BitTorrent network client program and version being utilized by the suspect computer. Law enforcement has the ability to log this information.

21.     A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. This address is unique to a particular computer during a specific online session. The IP address provides a unique "location," or address, as to each computer, making it possible for data to be transferred between computers.

22.     The computer running P2P software has an IP address assigned to it while it is connected to the Internet. Investigators are able to see the IP address of any computer system sharing files. Investigators can then search public records that are available on the Internet to determine the specific Internet Service Provider (ISP) who has assigned that IP address to that computer. ISPs maintain logs and records which reflect the specific IP addresses it assigned to specific computers that connect to the Internet through that ISP at any given moment. Based upon the IP address assigned to the computer sharing files, subscriber information then can be obtained from the ISP which contains identifying information of the individual to whom the account is registered.

23.     The computers that are linked together to form the P2P network are located throughout the world; therefore, the P2P network operates in interstate and foreign commerce. A

12

person who includes child pornography files in his/her "shared" folder is hosting child pornography and therefore is promoting, presenting, and potentially distributing child pornography. A person who hosts child pornography is in violation of 18 U.S.C. § 2252A(a)(3)(B) in that he/she is promoting and presenting child pornography in interstate and foreign commerce by means of a computer.

## SPECIFIC PROBABLE CAUSE

24.     Between July 10, 2021 and July 22, 2021, an FBI Guam Child Exploitation Special Agent (SA) conducted an undercover investigative session on a P2P network connection located in Tamuning, Guam while working in an undercover capacity. The SA operated software capable of receiving files from a torrent network. The SA identified an electronic device with IP address 182.173.233.32 (Target IP Address) as a potential download candidate (single source) for known child pornography files in the distribution of child pornography. The source file's SHA-1 hash value matched SHA-1 hash values of known child pornography maintained in a database by the National Center for Missing and Exploited Children (NCMEC). The SA successfully completed multiple downloads of files containing known child pornography which Suspect's Device at the Target IP Address was making available.

25.     During the timeframe between July 10, 2021 and July 22, 2021, the SA, through the use of the investigative BitTorrent program, successfully connected to the Suspect Device seven (7) times and made a record of the suspected child pornography files the Suspect Device was making available. The Suspect Device was the sole candidate for each connection, and as such, each file was identified directly from this Target IP Address.

26.     On July 27, 2021, the SA reviewed the associated files and provided a summary of three concerning files. A description of three of the video files being made available by the

13

Suspect Device are described as follows:

    a.  **First Download** - On July 17, 2021, the SA successfully completed a download of known child pornography files the Suspect Device at the Target IP Address was making available. The entire child pornography file was downloaded from the Suspect Device at the Target IP Address. The known child pornography file downloaded in the first download is further described as follows:

        i.  **File name**: bibcam - 12yo and 14yo boys blow and fuck for a long time. HiRes, Gay, Pedo, Preteen, PJK.

        ii.  **File type and size**: .mpg video file, 119 MB.

        iii.  **Description**: This video file is approximately 11:55 in length. In summary, this video depicts two completely nude males, one of whom is pre-pubescent, engaged in a multitude of sexual acts to include handjobs, blowjobs, and anal penetration.

    b.  **Second Download** - On July 17, 2021, the SA successfully completed a download of known child pornography files the Suspect Device at the Target IP Address was making available. The entire child pornography file was downloaded from the Suspect Device at the Target IP Address. The known child pornography file downloaded in the second download is further described as follows:

        i.  **File Name**: 11yo Preteen BJ + Anal Fuck with 10yo Boy Neighbor and His Dad

        ii.  **File type and size**: .avi video file, 64.2 MB

14

      iii. **Description**: This video file is approximately 13:31 in length. In summary, this video shows a pre-pubescent female engaging in oral sex with a pre-pubescent boy and an adult male. Furthermore, the boy performs oral sex and anal penetration of the female.

   c. **Third Download** - On July18, 2021, the SA successfully completed a download of known child pornography files the device at the Target IP Address was making available. The entire child pornography file was downloaded from the Suspect Device at the Target IP Address. The known child pornography file downloaded in the third download is further described as follows:

      i. **File name**: Bibcam - 15yo Boy fucks + cums on 10yo

      ii. **File type and size**: .mpg video file, 57.4 MB

      iii. **Description**: This video file is approximately 2:40 in length. In summary, this video depicts two boys, one post-pubescent and one pre-pubescent, engaged in multiple sexual acts to include handjobs, blowjobs, and the post-pubescent boy anally penetration and ejaculating on the younger boy.

27.    Pursuant to an administrative subpoena, on July 26, 2021, Docomo Pacific Inc, the Internet Service Provider (ISP) for the Target IP Address 182.173.233.32, provided the following Internet subscriber information for the Suspect Device:

| | |
|---|---|
| Name: | Sylvia G. Flores |
| Service Address: | 334 East Chalan Guma Yuus |
| | Sinajana, GU 96926 |
| Cell Phone No: | 671-777-2482 |

28.    On July 29, 2021, SA David Anderson conducted surveillance of 334 East Chalan Guma Yuus, Sinajana, GU 96926, hereinafter referred to as PREMISES. The SA found the property to be a one story residential, single-family home. The PREMISES has a fence

completely around the property and a Gray/Silver Lexus with Guam License Plate CP 2184 was parked in the driveway. A review of the Guam Police Department records for this vehicle registration showed the vehicle was registered to Sylvia Guerrero FLORES with the same address as PREMISES.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

29.     Most individuals who collect child pornography are sexually attracted to children, their sexual arousal patterns and erotic imagery focus, in part or in whole, on children. The collection may be exclusively dedicated to children of a particular age/gender or it may be more diverse, representing a variety of sexual preferences, including children. Child pornography collectors express their attraction to children through the collection of sexually explicit materials involving children as well as other seemingly innocuous material related to children.

30.     These individuals may derive sexual gratification from actual physical contact with children as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children.

31.     Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in explicit sexual activity. In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica" which is defined as any material, relating to children, that serves a sexual purpose for a given individual. It is broader and more encompassing, than child pornography, but at the same time the possession of such corroborative material, depending on

16

the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his intent. It includes things such as fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, cartoons and non-sexually explicit visual images.

32.     Child pornography collectors reinforce their fantasies, often by taking progressive, overt steps aimed at turning the fantasy into reality in some or all of the following ways: collecting and organizing their child-related material; masturbating while viewing the child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need-driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

33.     Child pornography collectors almost always maintain and possess their material in the privacy and security of their homes or some other secure location where it is readily available. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media. The collector is aroused while viewing the collection and, acting on that arousal, he often masturbates, thereby fueling and reinforcing his attraction to children. This is most easily accomplished in the privacy of his own home.

17

34.     Because the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, the collector may not dispose of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. Individuals who use a collection in the seduction of children or to document that seduction treat the materials as prized possessions and are especially unlikely to part with them. Even if a child pornography collector does delete files from his hard drive or other electronic media, a computer expert can still retrieve those files using forensic tools.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

35.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

36.     *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file

18

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

37.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable

19

cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.   As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and

20

malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the

21

computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence

22

of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to obtain child pornography over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

38.      *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.      The time required for an examination. As noted above, not all evidence takes the

23

form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

39.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the

24

warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

40.     It is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

41.     Based on the foregoing information, specifically that the Suspect's Device at the Target IP Address was observed making known child pornography available for download from the Internet, that the Target IP Address is assigned to the residential address located at the PREMISES described in Attachment A, and considering the characteristics of an individual that collects child pornography, I have probable cause to believe that evidence of a crime, contraband, fruits of a crime, other items illegally possessed, and property designed for use, intended for use or used in committing a crime, that is, violations of 18 U.S.C. §§ 2252 and 2252A, relating to material involving the sexual exploitation of minors, as set forth herein and in Attachment B, are currently located on the PREMISES. I, therefore, respectfully request that a search warrant be issued authorizing the search for, seizure of, and search of, the items set forth in Attachment B.

25

## REQUEST FOR SEALING

42.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation. Based upon my training and experience, I have learned that online criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums frequented by other criminals such as child sex offenders. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

Respectfully submitted,


David B. Anderson
Special Agent
Federal Bureau of Investigation

26

## ATTACHMENT A

*Property to be searched*

The premises to be searched is 334 East Chalan Guma Yuus, Sinajana, GU 96926, hereinafter referred to as "PREMISES". The PREMISES is a one story residential, single-family home, with a fence completely around the property. The PREMISES has the number "334" affixed to the structure and the mailbox.

See attached map and photographs for additional details.





28



29



# ATTACHMENT B

*Property to be seized*

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely violations of Title 18, United States Code, Sections 2252 and 2252A:

1. Computers or storage media used as a means to commit the violations described above.

2. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

    a. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

    b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c. evidence of the lack of such malicious software;

    d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

    e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

    f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

    g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

    h. evidence of the times the COMPUTER was used;

31

     i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

     j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

     k.  records of or information about Internet Protocol addresses used by the COMPUTER;

     l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

     m.  contextual information necessary to understand the evidence described in this attachment.

3. Routers, modems, and network equipment used to connect computers to the Internet.

4. Child pornography and child erotica.

5. Records, information, and items relating to violations of the statutes described above including

     a.  Records, information, and items relating to the occupancy or ownership of PREMISES, including utility and telephone bills, mail envelopes, or addressed correspondence; Records, information, and items relating to the ownership or use of computer equipment found in the above residence, including sales receipts, bills for Internet access, and handwritten notes;

     b.  Records and information relating to the identity or location of the persons suspected of violating the statutes described above; and

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions,

including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.